IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CASCADES AV LLC<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>SNELL LIMITED d/b/a SNELL ADVANCED MEDIA<br><br>　　　　　Defendant. | Civil Action No. 16-cv-04316<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGMENT

Plaintiff Cascades AV LLC ("Cascades") complains of Defendant Snell Limited d/b/a Snell Advanced Media ("Snell Advanced Media") as follows:

### THE PARTIES

1. Plaintiff Cascades is a Colorado limited liability company having a place of business at 2502 North Clark Street, Chicago, Illinois. Cascades holds total legal ownership of and has standing to sue for infringement of U.S. Patent Nos. 6,330,033, entitled "Pulse Detector for Ascertaining the Processing Delay of a Signal," 6,351,281, entitled "Delay Tracker," 6,836,295, entitled "Audio to Video Timing Measurement for MPEG Type Television Systems," 7,710,499, entitled "A/V Timing Measurement for MPEG Type Televisions," 8,810,659, entitled "Delay and Lip Sync Tracker," 9,071,723, entitled "AV Timing Measurement and Correction for Digital Television," and U.S. Patent App. Pub. No. 2015/0042880, whose inventor is J. Carl Cooper (collectively, the "Cooper Patents"). Mr. Cooper is a renowned and prolific inventor of more than 75 patents in the field of audio and video technology. The Cooper Patents relate to improvements in ascertaining and correcting the processing delay of a signal that has

become unsynchronized with other signals (such as when audio and video become unsynchronized), known generally as "lip sync error." Cascades is a subsidiary of Cascades Ventures, Inc., and was formed to help Mr. Cooper benefit from the licensing of his lip sync error correction inventions.

2. Defendant Snell Advanced Media is a United Kingdom limited liability corporation having a principal place of business at 31 Turnpike Road, Newbury, Berkshire, RG14 2NX. Cascades contends that Snell Advanced Media's media biometrics products and technology infringe at least U.S. Patent No. 9,071,723 (the '723 Patent) as alleged below. Snell Advanced Media has previously and is presently making, using, selling, offering for sale, and/or importing into the United States products that infringe one or more claims of the '723 Patent.

## JURISDICTION AND VENUE

3. This action arises under the patent laws of the United States, e.g., 35 U.S.C. §§ 271, 281, 283-285. Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1338(a).

4. Snell Advanced Media has transacted business by making, using, selling, or offering to sell and distributing products, in this judicial district, that infringe the '723 Patent. Accordingly, this Court has personal jurisdiction over Snell Advanced Media, and venue is proper in this Court under 28 U.S.C. § 1391(c) and/or 1400(b).

## FACTUAL BACKGROUND

5. Prior to March 2014 but well after the priority dates of the Cooper Patents, Snell Limited developed media biometric products such as the IQSAM00, a module that monitors video and audio confidence timing at various points within serial digital

interface (SDI) electrical systems and serial digital fiber optical systems. In September 2015, Snell Limited began operating under the brand of Snell Advanced Media. Snell Advanced Media continues to manufacture, market and distribute the IQSAM00 module as part of its IQ Modular Series.

6. Snell Advanced Media has known of the Cooper Patents since at least approximately October 1, 2015, the date that Cascades sent a notice of infringement to Snell Advanced Media. The notice of infringement included representative claim charts demonstrating Snell Advanced Media's infringement of certain claims of the Cooper Patents via its Media Biometric technology and Media Assurance Solutions, showing the IQSAM00 as being an exemplary infringing product. Not receiving any response, on November 18, 2015, Cascades' attorneys faxed a follow-up letter to Snell Advanced Media, asking it to respond by November 25, 2015. On December 14, 2015, Snell Advanced Media responded through counsel, solely to acknowledge the communication and to state that it would commence review of the infringement claim charts. Another month passed without communication, until Cascades' attorney again inquired on January 15, 2016, and again on January 26, 2016, when to expect a response. On January 28, 2016, Snell Advanced Media's counsel offered to speak by telephone, which occurred on February 3, 2016. During this telephone call, Cascades counsel noted the recent discovery of a United States patent that Cascades asserted describes the Snell Advanced Media technology (No. 8,682,651), and that supported the infringement allegations concerning the '723 Patent.

7. During the February 3, 2016 teleconference, Snell Advanced Media counsel stated that Snell Advanced Media would assert noninfringement positions with

respect to the '723 Patent, did not explain what they were, but stated that he would send a detailed explanation within the next two weeks. When that did not come, Cascades counsel sent additional detail on February 18, 2016 via email regarding the '723 Patent, naming more infringed claims. The February 18, 2016 email also pointed directly to the Snell Advanced Media patent (8,682,651) as providing insights into the products, allowing Cascades to name the additional infringed claims. Snell Advanced Media never responded to the February 18, 2016 email, and never denied that the Snell Advanced Media patent describes the technology of Snell Advanced Media products in sufficient detail to identify more infringed claims of the '723 Patent. The February 3, 2016 teleconference was the last Cascades heard from Snell Advanced Media before this suit.

8. Snell Advanced Media sells its products to customers in the United States including television networks, which use its Media Biometrics technology and Media Assurance Solutions, including those from the IQ Modular series, to identify, detect, and correct lip sync error. Snell Advanced Media's products also operate with network monitoring and network control systems to monitor lip sync information for excessive errors.

9. Infringing Snell Advanced Media products include, but are not limited to, its Media Assurance products including its Media Biometric Generators (MBGs) and Media Biometrics Signal Assurance Technology Assurance Points (APs). Infringing Media Biometric Generators (MBG) products include IQSAM00, IQMBG80, ICE/ICE SDC, Kahuna, and Sirius 800. Infringing Media Biometrics Signal Assurance Technology Assurance Point (AP) products include IQSAM00, RollMap and SigMA (Standard and Professional). The IQSAM00, part of the IQ Modular series, is example of

an infringing product that can function as a standalone Media Assurance Solution as both an MBG and an AP. Infringing features of SigMA include Lip Sync and Media Match. Infringing Snell Advanced Media products also include its RollCall products.

## COUNT I

## INFRINGEMENT OF THE '723 PATENT

10. Cascades hereby incorporates paragraphs 1-9 above by reference.

11. Snell Advanced Media has directly infringed and continues to directly infringe at least claims 1, 3-8, 16, 18, 19, 21-23, 25, 28, 36-38 and 44-46 of the '723 Patent through using, selling and/or importing its Media Assurance products including its Media Biometric Generators (MBGs) and Assurance Points (APs) (for example the IQSAM00, part of the IQ Modular series). Snell Advanced Media uses the infringing products at various trade shows in the United States, and, on information and belief, in testing.

12. Snell Advanced Media has also knowingly (since at least approximately October 1, 2015) and intentionally actively aided, abetted and induced others to directly infringe at least one claim of the '723 Patent (such as its customers in this judicial district and throughout the United States). Snell Advanced Media continues to induce infringement of the '723 patent. Snell Advanced Media has contributorily infringed and is a contributory infringer because, with knowledge of the '723 Patent (since at least approximately October 1, 2015), it supplies a material part of a claimed combination, where the material part is not a staple article of commerce, and is incapable of substantial noninfringing use. Snell Advanced Media contributes to its customers' infringement

5

because, with knowledge of the '723 Patent, it supplies the technology that allows its customers to infringe the patent.

13. Snell Advanced Media's infringement of the '723 Patent has been and continues to be willful and deliberate. Snell Advanced Media has refused to respond in good faith to Cascades' notices and attempts to discuss the Cooper Patents or the possibility of licensing them. This failure to engage includes Snell Advanced Media promising to send detail of its positions within two weeks, but then never communicating again.

14. Claim 44 is an exemplary infringed claim. Its preamble states: "In a television system having a first signal comprised of digital data carrying a television image, a second signal comprised of single or multi-channel audio digital data associated with the television image, which second signal may be carried by or with the first signal or separately, the television system including one or more repeating markers responsive to the second signal and associated in time with the television image of the first signal, an apparatus for determining the relative timing of the television image and the associated audio at a time after the first signal and the second signal have experienced respective delays, said apparatus comprising . . . ."

15. Products such as the IQSAM00, RollMap and SigMA operate in the environment of a "television system" of the preamble. Snell Advanced Media equipment inserts "repeating markers" in digital television signals (which inherently include the image portion "first signal" and the audio portion "second signal"). According to a marketing video posted by Snell Advanced Media on its website, these repeating markers are "fingerprints" injected into the signal stream:

> Media Biometrics is a media fingerprinting technology far in advance of anything the industry has seen previously. Tolerant of processing, such as encoding and decoding and frame rate conversion, Media Biometrics allows us to take a fingerprint or signature from media and then use that fingerprint later in a workflow. By analyzing the fingerprints from known points along a workflow, Media Biometrics can help us correct errors faster and implement genuine monitoring by exception, reducing the cost of operation. So let's look at how Media Biometrics works. There are two elements in the Media Biometrics ecosystem, so it is simple to understand and straightforward to implement. The first is the Media Biometrics generator, the origin of a fingerprint that will be used later in a workflow. This fingerprint is tiny, just a few octets of data, and transportable over IP networks consuming very little bandwidth. These generators are available as hardware or software versions across the sound product range.

These fingerprints (a.k.a. signatures) respond to the audio, and are associated with the television images corresponding to the same time in the media signal. According to a Snell Advanced Media white paper (also published on its website): "The underlying principle is that the algorithms look at the media file – video and audio – in both spatial and temporal planes, the way that a human would perceive it. The resulting signature, because it contains the essence of the picture and sound, is therefore impervious to format, frame rate, aspect ratio and color shift processing."

16. After the preamble, the first limitation of claim 44 states: "a) first delayed marker generator circuitry responsive to a first signal in digital form and which has been delayed and in response to a plurality of markers associated with a television image carried by said first signal, providing a corresponding first plurality of delayed markers."

17. Products such as IQSAM00, RollMap and SigMA contain this first limitation. These products contain circuitry that extracts the already-generated fingerprints / signatures out of the media stream. According to an IQSAM00 datasheet (also published on Snell Advanced Media's website):

7

> The IQSAM00 provides a fast and efficient way to monitor video and audio confidence and timing at various points within an SDI system. In broadcast systems maintaining the association and timing between video and audio signals to avoid an objectionable viewer experience has always involved a lot of time consuming set up, testing and monitoring by broadcast engineers and staff, but now IQSAM00 can provide the monitoring confidence that everything is correct and remains correct during live operation. It does this by generating and comparing video and audio signatures from the SDI stream and reporting back the delay value and an accuracy confidence, all without the need for potentially intrusive metadata insertion, or watermarking.

The same source reveals that the fingerprints / signatures may arrive at the IQSAM00 either carried on the media signal, or on a side channel over an Internet Protocol stream:

> IQSAM00 can operate as a purely SDI based module to compare two SDI streams (one 'known good' and one 'measured') in a 'probe' type application, or can transmit and receive fingerprints over IP, or within the SDI VANC data, for comparison with units at different locations within the facility or at a remote site.

18. After the first limitation, the second limitation of claim 44 states: "b) delayed marker generator circuitry responsive to a second signal which has been delayed, said second signal carrying audio in digital form which audio is associated with said television image, said delayed marker generator circuitry generating a second plurality of delayed markers in response to frequency related amplitude characteristics being present in said audio, said characteristics determined by the relationship of different frequency energies in response to the outputs of a plurality of filters which are responsive to said second signal."

19. Products such as IQSAM00, RollMap and SigMA contain this second limitation. These products generate a local version the fingerprint / signature from the media stream as it has arrived from a remote source. In particular, they generate the audio fingerprint (*i.e.*, such generation-circuitry is responsive to the "second signal," which is

8

digital audio). The Snell Advanced Media patent admits that a plurality of filters (labeled IIR and FIR) is involved:



Figure 2

The same patent (in column 5) admits that these are two filters whose output forms audio signature data:

> FIG. 2 is a block diagram of a circuit for generating audio signature data in accordance with an exemplary embodiment; and its operation will now be described. Audio samples, which have for example been de-embedded from the blanking intervals of one or more video fields or frames, are low-pass filtered in an infinite impulse response (IIR) filter stage **20** and the result is high-pass filtered in a finite impulse response (FIR) filter stage **30** having zero response at DC. The output of the FIR filter stage **30** is applied to a decimator **40**, and the sign bits of the output of the decimator **40** are taken and stored in memory to form exemplary audio signature data.

The same patent (in column 6) admits that these filter outputs represent a measure of the energy (*i.e.*, amplitude) of the sound in the frequency range that the filters let pass:

9

> Clearly, although in the exemplary embodiment the audio samples are sampled at a sampling rate of 48 kHz, the invention may be applied to audio samples at any sampling rate. In some embodiments the audio data may be rectified prior to the filtering process so that data values corresponding to the absolute magnitude of the audio samples are processed; the rectified and filtered data then represents a measure of the energy of the portion of the audio spectrum falling within the filter pass-band. In the illustrative embodiment values of k=1/512 and n=160 result in a filter that isolates a low frequency band extending from approximately 10 Hz to approximately 300 Hz. However, a person skilled in the art will be able to design other filter arrangements and select different parameters.

20. After the second limitation, the third limitation of claim 44 states: "c) in response to corresponding pairs of said first plurality of delayed markers of a) and said second plurality of delayed markers of b), finding the relative timing of said first signal and said second signal . . . ."

21. Products such as IQSAM00, RollMap and SigMA contain this third limitation. These products contain a comparator that identifies the section of the local audio signature data from the local audio that best matches the received audio signature segment. From this (and other data), the products calculate the relative delay between any audio channel and an associated video channel. The Snell Advanced Media patent admits this functionality in column 13. Related specification sheet documentation does as well: "It does this by generating and comparing video and audio signatures from the SDI stream and reporting back the delay value and an accuracy confidence, all without the need for potentially intrusive metadata insertion, or watermarking."

22. After the third limitation, the fourth and final limitation of claim 44 states: "d) wherein each of said electronic circuitry of elements a), b) and c) comprises analog and/or digital hardware."

23. The condition stated in the fourth and final limitation is true for products such as IQSAM00, RollMap and SigMA. For example, the IQSAM00 is an electronic card with both analog and digital hardware, as depicted in Snell Advanced Media documentation:

IQSAM00
3G/HD/SD-SDI
Signal Assurance
Module

24. As a direct and proximate consequence of the infringement, Cascades has been, is being, and, unless such acts and practices are enjoined by the Court, will continue to be injured in its business and property rights, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, but in no event less than a reasonable royalty.

25. Additional ones of the Cascades Patents have also been infringed, and Cascades reserves the right to amend the pleadings to state claims for infringement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Cascades asks this Court to enter judgment against Snell Advanced Media and against its respective subsidiaries, affiliates, agents, servants,

employees and all persons in active concert or participation with it, granting the following relief:

 A. An award of damages adequate to compensate Cascades for the infringement that has occurred, together with prejudgment interest from the date infringement of the '723 Patent began and statutory costs;

 B. An award to Cascades of all remedies available under 35 U.S.C. § 284;

 C. An award to Cascades of all remedies available under 35 U.S.C. § 285;

 D. A permanent injunction prohibiting further infringement, inducement and contributory infringement of the '723 Patent; and,

 E. Such other and further relief as this Court or a jury may deem proper and just.

## JURY DEMAND

Cascades demands a trial by jury on all issues so triable.

Dated: April 14, 2016

    Cascades AV LLC

    By: /s/ Robert P. Greenspoon_____
    Robert P. Greenspoon
    FLACHSBART & GREENSPOON, LLC
    333 North Michigan Avenue, Ste 2700
    Chicago, IL 60601
    T: 312-551-9500
    F: 312-551-9501

    **Attorney for Plaintiff**
    **Cascades AV LLC**